CARAWAY, J.
| Justin Price was convicted as charged of second degree cruelty to juveniles in violation of La. R.S. 14:93.2.3 after a jury trial. Price was subsequently adjudicated a fourth-felony habitual offender and received a sentence of 24 years at hard labor, without benefit of probation, parole or suspension of sentence. Price challenges his conviction and habitual offender adjudication. The State of Louisiana has appealed the sentence. We affirm the conviction and habitual offender adjudication. We vacate the sentence imposed and remand for resentencing.

Facts

Two and one-half month old I.P., the son of defendant and Ashley Coker,[1] was rushed by his mother to the Christus Coushatta Hospital emergency room on the afternoon of December 23, 2009. The child was unresponsive and had bruising on his buttocks, knees, legs, arms and face. Hospital personnel notified the Red River Sheriffs Department, which documented the child’s injuries. Law enforcement also *1215 observed that Coker had a black eye and bruising on her body. I.P. was initially diagnosed with pediatric trauma. He was later transferred to a Shreveport children’s hospital where his condition deteriorated; he began having seizures. A neurologist was consulted, and I.P. underwent emergency brain surgery to relieve pressure inside his skull caused by multiple subdural hemorrhages. I.P. also suffered from multiple broken bones, brain injuries of differing stages, | indicating more than one episode of shaking, multiple retinal hemorrhages, and hearing and vision loss.[2]
After law enforcement investigation of the events, both Coker and Price were charged with second degree cruelty to juveniles. The case against Price proceeded to trial in June 2012. Price was convicted as charged and subsequently adjudicated a fourth-felony offender. He was sentenced to 24 years at hard labor without benefits in March 2013. Price appeals his conviction and habitual offender adjudication. The state has appealed the imposed sentence.

Discussion

In his first assignment of error, Price argues that the evidence was insufficient to convict him of the charged offense due to the lack of evidence showing that he inflicted injuries to the child. Price argues that the uncorroborated testimony of Coker failed to exclude the reasonable hypothesis that she inflicted the injuries to I.P.
Coker was 25 years old when she testified at trial. She first met Price in 2008 and the two began dating and living together. At the time of trial, Coker testified that Price was 29 years old. In 2009, Coker found out she was pregnant, and the two moved into a trailer together. I.P. was born on October 1, 2009.
On December 22, 2009, Coker recalled that Price was sick and that the two had been up all night with I.P. Price allowed Coker to go back to bed while he took care of I.P. Coker got up at approximately 1:00 p.m. that | safternoon. When she saw Price and I.P., the baby was on the floor asleep next his father, who was playing a video game in front of the TV. Price complained that the baby was fussy and always crying.
At both 1:00 p.m. and 5:00 p.m., Price demanded that Coker give him a Xanax. Coker had been prescribed the drug for a bipolar disorder. Coker refused both of Price’s requests for the drug. Some time after the second refusal, Price started screaming at Coker again demanding that she give him the drug “to calm his head down.” Coker testified that Price “snatche[d] him (I.P.) up by the arm.” Coker immediately retrieved I.P. from his father and began to feed him a bottle. Thereafter, Coker described the events as follows:
I start feeding him a bottle.... And Dustin’s still complaining and hollering and screaming. And I’m just ignoring him. I get up to get away from it, to go inside the bedroom and Dustin follows me. And in that time he’s pushing me, while I have [I.P.] in my arms. And there was clothes in the floor in the kitchen, and I tripped over them. I fell on my back. And when I did, Dustin was over me hollering and screaming, f* * * you, pack your s* * *, get out and leave, I want all your s* * * gone, all you all just get out. Just keep on. Started punching, screaming, kicking me with his feet and then dragging my hair around the floor. The floor’s, it’s not *1216 hardwood floor, but it’s a floor that you can drag somebody around on. He started pulling me and dragging me by the hair. I holler — I just holler out, .quit, quit, please quit. And then he finally he stops. I get up and I’m checking on [I.P.] making sure he’s okay.
Coker testified that during these events, I.P. was in her arms. She went into one of the bathrooms on the other side of the house. Price kicked her in the back and she almost fell. She started for the front door with Price behind her. According to Coker, Price pushed her and the baby, and she fell out of the door. She “somewhat caught the fall,” but ended up on the ground with I.P. in her arms. Coker got up as Price continued to scream. |4She stayed outside until he calmed down and went back into the trailer. At this time, Price apologized to Coker and checked on I.P.
Coker testified that she then put I.P. to sleep and a couple of hours later discovered that she needed diapers. She asked Price for money and went to the store, intending to bring I.P. Coker testified that Price told her to leave the child with him instead and to buy medicine. Coker left the home for 1 to 1-1/2 hours. Upon her return, Price “flings open the door and is hollering” that he was sick of I.P.’s crying. Coker stated that she went into the house and found I.P. screaming and crying. She asked Price what he had done. Coker testified that she started feeding I.P., and he went to sleep. As she began to bring the baby into the bedroom, Price grabbed her ponytail and pulled her to the ground. Coker testified that he started kicking, screaming and demanding that she give him the Xanax, “all over again.” Ultimately, Coker testified that she gave him the Xanax. She and I.P. went into the bedroom where they fell asleep. Within two hours Price came into the bedroom and went to sleep without further incident.
Coker testified that the following morning, December 23, she got up and performed her daily routine of preparing Price for work and getting I.P. fed and changed. She stated that Price began looking for the money he had given her the night before. He began to accuse her of stealing the money, and he pushed her. She caught herself before she fell on I.P. Price then stormed out and drove off in his truck. Coker stated that during these events I.P. was crying.
Coker testified that it was later that she noticed that I.P. had a fever. Upon earlier instructions by Price’s mother, Coker gave the baby infant | ¡/Tylenol. After Coker prepared I.P. a bottle, she came back into the room to find him unresponsive. She testified that she tried to wake him up, but his arms were “flimsy.” She then thought to put him in a bathtub of cold water. As she did so, however, Coker testified that she dropped the baby on the side of the baby bathtub, hitting his leg on the side of the tub. She placed him in the icy water, but he remained unresponsive. Coker then called Price’s father, David Price, who lived six or seven miles away. The elder Price drove the mother and baby to the Coushatta Hospital for treatment.
As I.P. was being transferred to the Shreveport hospital later that evening, Price arrived. Coker stated that she went to a safe house because she was scared to go home. She testified that as the result of her altercation with Price, she had her hair pulled out, a black eye, and bruises on her arms, back and legs. Coker identified photographs of her injuries, which were introduced into evidence.
Coker testified that Price hurt I.P. in the fights she described, and that throughout the punching, kicking, and knocking, I.P. was crying and trying to move around. *1217 Coker admitted that she initially pled guilty to second-degree cruelty to a juvenile but later withdrew her plea. Her case was still pending. She also admitted to a couple of criminal convictions.
On cross-examination, Coker admitted that Price was working in Texas at the time I.P. was brought to the hospital. She admitted that she told officers that Price “never hurt I.P. and was a good daddy.” She also conceded that she gave her statements to officers prior to being criminally charged. Coker later explained that she made those statements because she was being bombarded with questions at the hospital and was afraid of Price. 16She ultimately told the supervisor of the safe house “everything” because she felt safe.
Vernon Perrin, a criminal investigator with the Red River Parish Sheriffs Department, testified that he was present at LP.’s admittance. He stated that the baby was in pain and had bruises on his buttocks, knees, legs, arms, head and face. Perrin photographed I.P.’s injuries; the state introduced these photographs into evidence. Perrin identified one photograph of bruises on the child’s right upper arm, which showed four fingerprints. Per-rin testified that Coker told him that she did not think Price could have done it when she left I.P. with him the day before.
Johnny Ray Taylor, an investigator for the Red River Parish Sheriffs Office, also photographed I.P.’s injuries. The state introduced these photographs into evidence. Investigator Taylor testified that from the evidence he collected, he learned that I.P. had multiple broken bones, brain injuries in different stages, multiple retinal hemorrhages, and hearing and visual loss. Taylor filed an arrest affidavit for Price.
On cross-examination, Taylor stated that he filed the arrest affidavit based on the evidence he collected, which included information that Price was working in Texas at the time I.P. was taken to the hospital, but also that Price was at home when I.P. suffered his injuries.
Dr. Phillip Utter, a neurosurgeon and a witness for the state, performed surgery on I.P. two days after he was brought to the hospital, on Christmas night.[3] Dr. Utter described LP.’s case as “unforgettable.” He |7stated that when he first saw I.P., he was lethargic and having continuous seizures. A CT scan of the child’s head showed “a fair amount of increased intracranial pressure.” Dr. Utter could tell that I.P.’s head was swollen and under a lot of pressure. He also diagnosed retinal hemorrhages and prior rib fractures.
Dr. Utter testified that he saw old and new “serious neurological injuries” in the brain. He stated that the “likelihood of any sort of successful outcome in this situation was very low.” He concluded that the child was in “a very high risk of death,” and that it was “fortunate that the child made a recovery.”
Dr. Utter concluded that I.P. suffered nonaccidental trauma and that his pattern of injuries were far beyond “a fall in the bathtub.”[4]
Dr. Margaret Ann Springer, a clinical assistant professor of pediatrics at LSU *1218 Health Sciences in Shreveport and a witness for the state, observed I.P. She identified I.P.’s numerous injuries. Dr. Springer stated that I.P. had suffered life-threatening nonaccidental trauma, shaken baby syndrome, and that it was her opinion that I.P. had suffered his acute injuries within the 24 hours prior to his hospital arrival. Dr. Springer explained that this type of injury is “mildly or relatively” asymptomatic until bleeding develops to such an extent in the brain that it causes swelling or pressure. Seizures then occur, and surgery is required to drain the blood and release the pressure. Dr. Springer explained that swelling appears 12-24 hours after an injury. [ sWith a child, the findings are subtle because babies sleep so much. Dr. Springer testified that in her opinion, the bleeding in I.P.’s eyeballs and brain were caused by violent shaking back and forth that could have occurred in a number of seconds.
Dr. Springer testified that punching, kicking and falling down stairs would cause bruising and some of the other things I.P. exhibited.
On cross-examination, Dr. Springer testified that dropping a baby in a bathtub or on a bathtub may cause some bruising but would not cause injuries to the baby’s brain and eye.
Price’s mother and father testified in his defense. His mother, Donna Price, testified that she took care of I.P. two days before the incident and that he was okay. She normally took care of the child twice a week; he was her only grandbaby. She identified a photograph of I.P. that she took two days before his hospitalization. The defense introduced the photograph into evidence. Mrs. Price testified that she had been a pediatric nurse for 14 years and that she never saw her son hurt I.P.
David Price testified that on December 23, 2009, Coker called and told him that she had given the baby Tylenol and that he would not wake up. He and his sister immediately drove over. He described the situation as follows:
We drove up, the door was open on the trailer. And I could see from the car — I was probably, I guess, thirty foot from the house where they live, the trailer house where they live. And the door was open and I could see Ashley sitting in a chair, the couch or whatever, and she was panicked. And she was shaking the baby and slapping him on the back screaming, wake up I.P. And I come into the house and I said, stop it. And she stopped. And she kind of handed me the baby. And he was ice cold. I said, why is he cold? I thought he was dead. And she said, 119put him in ice water to try to make him start breathing. And all he was doing was just gasping for breath. He wasn’t breathing in; he was just breathing out.... And I said, in Jesus name, and I laid him on my shoulder. And when I did his eyes opened and he started to breathe.
David Price testified that after they got into the car, Coker began to shake the baby and he again told her to stop.
On cross-examination, David Price testified that he gave a written statement that he was told that Price and Coker had a big fight the night before and that was when “I.P. got hurt.”
The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d *1219 248 (2004). This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 48,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct 11 (¡evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. Speed, supra. A conviction based upon circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.
It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir. 1988), writ denied, 532 So.2d 148 (La.1988). The trier of fact hears the testimony first hand and unless the factfinder’s assessment of believability is without any rational basis it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a factfinder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, 11writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
In Louisiana a conviction may be sustained on the uncorroborated testimony of a purported accomplice, although the jury should be instructed to treat the testimony with great caution. When the accomplice’s testimony is materially corroborated by other evidence, such language is not required. State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047.
Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of 17 to any child under the age of 17 that causes serious bodily injury or neurological impairment to that child. La. R.S. 14:93.2.3. For purposes of this Section, “serious bodily injury” means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death. Id.
When viewed in the light most favorable to the prosecution, we find the evidence sufficient to support Price’s conviction for second degree cruelty to juveniles beyond a reasonable doubt. The physicians’ medical diagnoses of life-threatening nonacci-dental trauma and shaken baby syndrome *1220 were unquestioned. Thus the sole disputed issue for the jury to resolve was whether the remaining evidence established that Price participated in or solely inflicted the injuries to the child. That evidence consisted mainly of Coker’s testimony, a party also responsible for the child’s care. However, the evidence of the physical injuries to Coker herself corroborates Coker’s testimony of Price’s violence.
_|_^Coker testified that it was Price who pushed, kicked, punched, and dragged her on the ground by her hair while she held I.P. on two separate occasions the day before I.P.’s hospitalization. Her testimony also established that he pushed the mother and baby out the front door where she fell to the ground. Coker’s injuries were established by the evidence. She stated that during her altercations with Price, the child was injured. Moreover, on that afternoon, Price stayed alone with the child for over an hour. When Coker returned, Price was agitated, and the baby was crying. Obviously the jury accepted this testimony as credible. David Price corroborated that the couple’s fight on December 22 was the time the baby was hurt. Ultimately, Dr. Springer’s testimony established that I.P.’s symptoms would have begun to exhibit themselves in the 12-24 hour period after the injuries were inflicted. She testified that the events Coker described were consistent with the baby’s injuries.
Price’s participation in inflicting the child’s injuries can reasonably be inferred from this proof of facts and circumstances. The evidence supports the jury’s conclusion that it was Price who injured I.P. and shook him during the events that transpired on December 22. The jury could have reasonably rejected any evidence that Coker’s shaking of the child in the minutes before he was taken to the hospital caused the brain swelling and resultant complications. The jury’s determination that the direct, circumstantial and medical evidence as presented by the state was sufficient to establish beyond a reasonable doubt Price’s participation in the infliction of serious bodily injury and neurological impairment to I.P. was not erroneous. This assignment of error lacks merit.
hüPrice next argues that the trial court erred in adjudicating him a fourth-felony offender because he was not adequately informed of his right to trial by jury in one of his predicate offenses.
On July 30, 2012, the state filed a habitual offender bill of information alleging that Price was a fourth-felony offender with the following past felony convictions: (1) February 26, 2002, guilty plea in Docket No. 92,494, in the 39th Judicial District Court, to simple burglary (sentenced to five years, with four years suspended and active probation); (2) December 17, 2003, guilty plea in Docket No. 97,197, in the 39th Judicial District Court, to possession of Schedule II CDS (cocaine) (sentenced to eight years at hard labor, with four years suspended with supervised probation); (3) November 4, 2005, guilty plea in Docket No. 71,537, in the 26th District Court, to possession of Schedule II CDS (methamphetamine) (sentenced to four years at hard labor); and (4) the present conviction.
On August 20, 2012, Price appeared with newly retained counsel and denied all allegations contained in the habitual offender bill. Thereafter in his answer, Price alleged that he had not been properly Boyk-inized[5] in one of the prior offenses. He further asserted that the mandatory mini *1221 mum sentence would be constitutionally excessive in this particular case.
Price’s habitual offender proceedings were held on March 12 and 19, 2013. The state introduced the testimony of Price’s probation officer on the prior offenses and fingerprint experts. The state also introduced penitentiary |14packs relating to Price’s prior convictions. Price stipulated to the admissibility of the records for purposes of authenticity only.
On May 10, 2013, the court rendered an amended ruling,[6] which rejected the argument that Price was not sufficiently advised of his right to a jury trial. Thus, the court adjudicated Price a fourth-felony offender.
On appeal, Price argues that his November 4, 2005 guilty plea to possession of Schedule II, Methamphetamine (Doc. No. 71,537), his third felony offense, was “void of any mention that Mr. Price was ever advised of his right to a jury trial.”
Price’s guilty plea and sentencing transcript of November 4, 2005, shows the following colloquy between Price and the trial court:
The Court: He’s also explained to you the nature of this plea bargain that has—
Mr. Price: Yes, sir.
The Court: —been done with the State? All right, sir. Now, Mr. Price, you understand that you have the right to continue your not guilty plea and have a trial?
Mr. Price: Yes, sir.
Attached to the transcript of the guilty plea submitted into evidence, however, was a transcript of Price’s April 25, 2005 arraignment for the same offense, before a different judge, which reads as follows:
The Court: Formal arraignment waived, pleas of not guilty entered to each charge. Mr. Price, these are felony charges which entitle you to trial by jury. You can waive that right and be tried by a judge alone. You do not have to make that decision today.
Mr. Price: Yes, sir.
I isThe record also reflects that in his two previous guilty pleas, in 2002 and 2003, Price was clearly and succinctly advised of his right to trial by jury.
In State v. Shelton, 621 So.2d 769 (La.1993), the Louisiana Supreme Court discussed the state’s burden of proof in a habitual offender proceeding as follows:
If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a “perfect” transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers. If the State introduces anything less than a “perfect” transcript, for example, a guilty plea form, a minute entry, an *1222 “imperfect” transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendant’s prior guilty plea was informed and voluntary, and made with an articulated waiver of the three Boy-kin rights.
The federal constitutional standards set out in Boykin require that a guilty plea be recorded showing that the defendant was informed of and waived three specific rights. These rights are the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one’s accusers. State v. Guzman, 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158. The trial court cannot rely on an assumption that defense counsel adequately informed the defendant of his rights. State v. Markray, 45,129 (La.App.2d Cir.4/21/10), 35 So.3d 453. Prior guilty pleas cannot |1(ibe utilized to infer the defendant’s knowledge of his rights when pleading guilty in a later case where no evidence exists to demonstrate that a defendant was properly Boykinized at the prior pleas. State v. Lawson, 410 So.2d 1101 (La.1982).
The Louisiana Supreme Court has stressed that Boykin does not set out a magic word formula that may serve as a technical trap for conscientious trial judges who conduct a thorough inquiry into the validity of the plea. State v. Dodson, 07-0057 (La.11/2/07), 967 So.2d 487; State v. Mendenhall, 06-1407 (La.12/8/06), 944 So.2d 560. Likewise, the Louisiana Supreme Court has ruled that courts may look beyond the guilty plea colloquy to an expanded record to determine whether a voluntary waiver of Boykin rights has occurred. Lawson, supra. This court has applied this standard to predicate offenses utilized in proof of multiple offender proceedings. State v. Russell, 46,426 (La.App.2d Cir.8/17/11), 73 So.3d 991, writ denied, 11-2020 (La.2/10/12), 82 So.3d 270. The Boykin rights may be successfully conveyed in words tailored to a particular individual’s vocabulary and comprehension. Mendenhall, supra.
In State v. Worsham, 32,670 (La.App.2d Cir.2/1/00), 754 So.2d 1107, this court found a defendant’s guilty plea valid despite the fact that the trial court did not inform him of his right to a jury trial at the time he pled guilty because the record showed that the defendant was informed of his right to a jury trial at his arraignment. In State v. Honeycutt, 41,601 (La.App.2d Cir.2/28/07), 953 So.2d 914, this court validated a guilty plea where the court asked defendant if he knew he had a right to a trial because 117the record showed that the defendant was informed of his right to trial by jury at his arraignment. In State v. Ford, 41,949 (La.App.2d Cir.5/9/07), 957 So.2d 311, writ denied, 07-1377 (La.1/7/08), 973 So.2d 733, the defendant challenged his guilty plea on the grounds that he was not adequately informed of his right to trial by jury; the court informed him that he had a right to “have a trial.” This court validated the plea after determining that the defendant had been informed of his right to a jury trial at an earlier sanity hearing.
Considering this jurisprudence and the facts of the present case, we conclude that the record supports a finding that for the proof of this predicate offense, Price was adequately informed of his right to a trial by jury and that his waiver of that right was knowingly and voluntarily made. In this matter, Price did not directly challenge the plea. While reiterating our previous instruction that the better practice is to inform a defendant of his right to trial by jury at the time of the guilty plea, we find that any omission in this guilty plea *1223 was cured by the informing of rights at arraignment.
The final issue for our review concerns the excessiveness of the sentence imposed on Price. The state has appealed the sentence arguing that the trial court erred in deviating below the mandatory minimum sentence of 40 years required by La. R.S. 15:529.1. Specifically, the state argues that Price failed to show by clear and convincing evidence that he was the exceptional defendant for which downward departure was justified and that the court failed to articulate any reasoning sufficient to support a downward departure from the statutory minimum. Price argues that the imposition of |1sthe mandatory minimum sentence in this case would be constitutionally excessive. He also suggests that the District Attorney’s choice to seek habitual offender status based upon the defendant’s refusal to take a plea may amount to an unconstitutional discriminatory application of the habitual offender law.[7]
Price’s sentencing hearing was held on June 25, 2013. The court noted that it had considered Price’s presentence investigation report and his status as a fourth-felony offender and noted that the sentencing range for a fourth-felony offender convicted of second degree cruelty to juveniles was 40 years to life imprisonment. La. R.S. 15:529.1(A)(4)(a). The court considered as aggravating factors under La. C.Cr.P. art. 894.1 the seriousness of the crime committed, the undue risk that Price would commit another crime, Price’s extensive record and need for correctional treatment. The court also determined that a lesser sentence would deprecate the severity of the offense. In mitigation, the court considered Price’s age and Coker’s liability for the offenses against the child.
The court concluded that it felt that the requirements under La. R.S. 15:529.1 would be “constitutionally excessive,” and stated that it intended to deviate from the mandatory guidelines. Accordingly, the court sentenced Price to 24 years at hard labor, without benefit of probation, parole, or suspension of sentence. The state objected to the court’s ruling.
Because the habitual offender law is constitutional in its entirety, the minimum sentences it imposes upon recidivists are also presumed to be | ^constitutional. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Lindsey, 99-3302 (La.10/17/00), 770 So.2d 339; State v. Burks, 47,587 (La.App.2d Cir.1/16/13), 108 So.3d 820, writ denied, 13-0424 (La.7/31/13), 118 So.3d 1116. A sentencing judge must always start with the presumption that a mandatory minimum sentence under the habitual offender law is constitutional. A court may depart from the minimum sentence if it finds that there is clear and convincing evidence in the particular case before it that would rebut this presumption of constitutionality. Johnson, supra. To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is exceptional, which in this context means that because of unusual circumstances, this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Id. Departures from mandatory minimum sentences by their nature must be exceedingly rare. The classes of exceptional offenders for whom presumptively constitutional manda *1224 tory minimum sentences, but nevertheless excessive as applied to them, are exceedingly narrow. State v. Noble, 12-1923 (La.4/19/13), 114 So.3d 500. To overcome the presumption that a mandatory penalty prescribed by the legislature is constitutional as applied to a particular offender, the trial court must make two findings on the record. First, the jury must find clear and convincing evidence that the offender is exceptional as defined in Johnson, supra. Second, the trial court must articulate specific reasons why the sentence he imposes, instead of the statutory mandatory minimum, is the longest | ¡^sentence that is not excessive under the Louisiana Constitution. State v. Lawrence, 14-0081 (La.4/11/14), 136 So.3d 795, 2014 WL 1407725.
A trial judge may not rely solely upon the nonviolent nature of the instant or past crimes as evidence that justifies rebutting the presumption of constitutionality. The lack of violence cannot be the only reason, or even the main reason for declaring such a sentence excessive. Johnson, supra; Lindsey, supra; Burks, supra.
In brief, Price has failed to put forth any facts or arguments to support his conclusion that he is the exceptional defendant for whom downward departure from the mandatory minimum life sentence is required. At the sentencing hearing, his only argument for support of the downward departure was the nonviolent nature of his prior offenses. Otherwise the sole reason for the court’s imposition of sentence was the “domestic situation” between Price and Coker and its feeling that the “requirements under R.S. 15:529.1 would [be] constitutionally excessive if that was given to Mr. Price.”
On this record we cannot say that Price has demonstrated by clear and convincing evidence that he is the exceptional defendant for which downward departure is justified. His sole argument that his prior offenses were not violent are insufficient on their own to establish his burden because the violent nature of the offenses are taken into account in the statutory sentencing scheme. Likewise, the court articulated no further persuasive argument for the downward departure. For these reasons, we vacate the sentence and remand the matter for resentencing to a term of imprisonment | ainot less than the mandatory minimum of 40 years required by law. See Noble, supra.

Decree

For the foregoing reasons, Price’s conviction and habitual offender adjudication are affirmed. His sentence is vacated and the case is remanded for resentencing to a term of not less than the mandatory minimum of 40 years as required by law.
CONVICTION AND HABITUAL OFFENDER ADJUDICATION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.

. At the time of trial, Coker and Price had married.

. Amazingly, the child survived but remained hospitalized for several weeks. He has since been adopted.

. Dr. Utter testified that he made four small incisions on I.P.’s head to drain out the sub-dural fluid products, which he described as a mix of old and new. Dr. Utter stated that “usually the intracranial pressure is around, something less than 20.” He remembered "in this case that basically the fluid shot across the room,” “was under substantial amount of pressure,” and “projected about 2½ feet from the head,” which would be “unusual and severe to ever see that in the operating room.”

. Dr. Utter expressed no opinion as to who injured I.P.

. This term refers to the three mandatory rights, including the right to trial by jury, of which a defendant must be informed prior to entering a guilty plea in accordance with Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

. In brief, the State indicates that the trial court had issued another written ruling which adjudicated Price a fourth felony offender, but inadvertently quoted the third felony offender law. This original ruling is not contained in the record before us.

. Price raises this issue for the first time on appeal. His failure to file a motion to reconsider sentence including this issue precludes him from now raising it on appeal. La. C.Cr.P. art. 881.1.