Judgment rendered April 8, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,781-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

AMIN BARKATALI VIRANI                       Appellant

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of East Carroll, Louisiana
Trial Court No. 108,183

Honorable James Hugh Boddie, Jr., Judge

* * * * *

LOUISIANA APPEALS AND                       Counsel for Appellant
WRIT SERVICE
By: Annette Fuller Roach

LIZ MURRILL                                 Counsel for Appellee
Louisiana Attorney General

J. TAYLOR GRAY
DANIEL J. SMART
Assistant Attorneys General

* * * * *

Before PITMAN, COX, and HUNTER, JJ.

**COX, J.**

This appeal arises out of the Sixth Judicial District Court, East Carroll Parish. Amin Virani was found guilty by a unanimous jury of attempted second degree murder and sentenced to 25 years at hard labor without the benefit of probation, parole, or suspension of sentence. Virani now appeals his conviction and sentence. For the following reasons, we affirm Virani's conviction, vacate his sentence, and remand for resentencing.

## FACTS

Virani was accused of shooting at and attempting to kill Matthew Meadows. He was charged by bill of information on August 4, 2016, with one count of attempted second degree murder in violation of La. R.S. 14:27 and 14:30.1. The trial began on September 13, 2024, where the following testimonies and evidence were presented:

Deborah Hopkins testified that she is the 9-1-1 director for East Carroll Parish. She stated that she pulled the requested 9-1-1 phone calls from November 12, 2015, and downloaded them to a USB drive. Ms. Hopkins identified the USB drive and two calls were played for the jury from Meadows and his ex-wife, Rachel Meadows ("Rachel").

Dr. Bart Liles testified that he is a general surgeon in Monroe, Louisiana, and was accepted as an expert in general and trauma surgery. He stated that after Meadows became a patient of his, he learned that his wife and Meadows' wife are first cousins. Dr. Liles testified that the first time he met Meadows was when he was contacted to remove a bullet from Meadows' arm. He stated that he removed the bullet and gave it to Trooper Sannika Williams. Dr. Liles stated that the bullet was just beneath the skin near Meadows' elbow.

East Carroll Parish Chief Deputy Bill Hopkins testified that he was the chief investigator at the time of the incident. He stated that he responded to Rachel's house after the 9-1-1 call. He testified that when he arrived at the house, Rachel's daughter ran to him, bear-hugged him, and said, "Daddy's trying to kill mama[.]" Dep. Hopkins stated that when he asked Rachel what happened, she told him that Meadows raised his gun so she raised her gun and shot at him, which is what she said on the 9-1-1 call. Rachel then told Dep. Hopkins that Meadows threw his gun out of his truck window. When Dep. Hopkins asked her where Meadows' gun was located, she showed him a .38 revolver wrapped in a black cloth on the kitchen counter. He testified that when he cleared the weapon, there were four live rounds and one spent round in the cylinder. Dep. Hopkins asked Rachel where her gun was located, and she retrieved a .380 automatic pistol from a back bedroom. He stated that when he cleared the .380, it was not loaded.

Dep. Hopkins testified that he bagged the weapons and the rounds found in the .38 and asked Rachel to show him where the shooting took place. He stated that from what he observed, "it looked like it was a one-sided deal." He testified that he saw four or five .380 casings in the driveway, and the gravel looked as though someone drove away quickly. Dep. Hopkins stated that because the scene did not seem to match Rachel's account of what happened, he called the State Police. He testified that Rachel told another deputy a different version of events, but he could not recall that version. The State replayed Meadows' 9-1-1 call and Dep. Hopkins testified that Meadows said, "I don't know what he shot me with"; "Some guy I don't know"; "he's coming out"; "the guy is coming up behind me again"; and "the guy is in a Hyundai, I'm following him."

2

Delhi Police Officer Craig Frasier testified that he was working for the East Carroll Sheriff's Department at the time of the shooting. He stated that on the day of the shooting, he was dispatched to the intersection of Hwy 2 and Hwy 65. He testified that when he arrived, he met with Meadows, who was parked in his truck, and asked him what happened. Based on his memory and report, Officer Frasier stated that Meadows told him that as he was speaking with Rachel about custody of the children, he could see someone standing in the dark, the man called Rachel to him to talk, the man started shooting at him, and he retreated to his vehicle. Officer Frasier testified that when he questioned Meadows, Meadows described the shooter as either "Indian" or "Mexican." He stated that he saw blood on Meadows' arm and what appeared to be bullet holes in the truck. Officer Frasier stated that he called an ambulance for Meadows and secured the truck until investigators arrived.

On cross-examination, Officer Frasier admitted that he stated in his report that Meadows said he was shot by his ex-wife. On redirect, Officer Frasier read his report for the jury, where he relayed the same information that he testified to in his earlier testimony. He clarified that the line stating that Meadows was shot by his ex-wife was a summary of what he was told from dispatch.

Louisiana State Trooper Sanikka Williams testified that she is currently a Lieutenant over criminal investigations and led the investigation into Meadows' being shot. She stated that when she arrived at Rachel's residence, she was briefed by the Sheriff's deputies and other State Police detectives. She testified that Rachel gave three different accounts of the shooting. Crime scene photos were introduced during Lt. Williams'

3

testimony. Lt. Williams identified tire marks leaving the driveway and four shell casings found in the driveway, all of which correlated with where Meadows' truck was parked.

Lt. Williams also identified photos of Meadows' truck, which depicted bullet holes in both the driver's and passenger's windows. She testified that glass was found inside the vehicle, which indicated that the bullet was shot from the outside. She stated that they found Meadows' 9 mm Smith & Wesson inside his vehicle. Lt. Williams stated that the gun inside Meadows' vehicle showed inconsistency in one of Rachel's versions of events that Meadows threw his gun out of the window. She testified that Meadows' 9 mm could hold eight bullets, and eight unfired bullets were found in the weapon. Lt. Williams stated two bullet fragments were also found inside Meadows' truck.

Lt. Williams identified the revolver that was wrapped in cloth and recovered from Rachel. She stated that it contained four live rounds and one fired round. Lt. Williams also identified the Ruger .380 that Rachel retrieved from her bedroom, which could hold six bullets but was empty. Lt. Williams stated that the fact that the .380 was empty indicated it was fired. She testified that the four casings found at the scene were determined to have been shot from the .380.

Lt. Williams testified that she ran the license plate number of the car that chased Meadows, and the vehicle was rented to Zaheer Virani. She stated that once they were able to get Zaheer's driver's license photo, they compiled a six-photo lineup for Meadows to identify the shooter, and Meadows identified Zaheer as the shooter but noted his hair was shorter in the picture. She stated that she obtained an arrest warrant for Zaheer,

4

executed the warrant, and two days later, asked that the warrant be recalled because Zaheer was not the shooter. She stated that Zaheer was located at The Smoker's Oasis in Monroe; and, based on the information they obtained from Zaheer's interview, they arrested Virani. Lt. Williams testified that Zaheer was able to provide an alibi for the time of the shooting by showing them the inside surveillance video from his store in Monroe. She stated that Zaheer was inside the store in Monroe at the time and not in Lake Providence.

Lt. Williams testified that she obtained cell phone records and location information for Virani's cell phone. She stated that cell site coordinates placed Virani in Lake Providence. She stated that they then obtained a search warrant to ping Virani's phone, which placed him in Irving, Texas. Lt. Williams stated that they later learned Virani had already flown out of the Dallas airport to India. Lt. Williams testified that through her investigation, she learned that the motive for the shooting was to kill Meadows and provide Virani with a portion of Meadows' life insurance; Meadows had a $75,000 life insurance policy, and Rachel was the beneficiary.

Lt. Williams testified that Virani was arrested eight or nine months later at Dulles International Airport in Virgina and transported back to Lake Providence. She identified Virani's Statement of Rights form, where he indicated he was not willing to answer questions. Virani's interview was played for the jury. Virani's counsel objected multiple times during the playing of the interview because Virani asserted his right to counsel in the interview, and the prosecutor asked Lt. Williams why she believed certain

5

statements were relevant to her investigation; all of these objections were overruled.

On cross-examination, Lt. Williams admitted that she made a "mistake" during Virani's interview when she told him that Meadows identified him. When asked why she continued to question Virani after he made multiple statements that he wanted a lawyer, she stated, "There's nothing wrong with me talking, and I wanted him to know what I knew." She also stated that Virani did not admit to committing the crime or planning anything with Rachel.

David Howard testified that he was a transportation officer and assisted in bringing Virani back to Louisiana. He stated that Virani talked constantly in the nine hours they were in the vehicle together. Mr. Howard testified that while he was transporting Virani, Virani stated, "I know what I did was stupid, and I have to live with it," or "What I did was stupid and I have to live with it."

Rachel testified that she pled guilty in 2021 to principal to attempted second degree murder and received a 15-year sentence. She stated that on the day of the shooting, Meadows brought their two daughters to her house about seven o'clock in the evening. She testified that she was with Toby, whom she identified as Virani, when Meadows brought the girls back. Rachel stated that she had known Virani for about a year, and it was her idea for him to shoot Meadows in exchange for life insurance proceeds. She testified that when Meadows dropped off the girls, Virani was on the back porch, and she walked into the carport to talk to Meadows. She stated that Meadows was "hollering and fussing," Virani came around from the back porch, and Virani started shooting. Rachel testified that she did not know

6

what kind of guns were used, but she took the guns from her parents and gave them to Virani.

Rachel testified that after Meadows got in his truck and drove away, she went inside to check on the girls, and Virani left. She was unaware of where Virani went. Rachel did not recall what she said to the 9-1-1 operator and did not want to listen to the 9-1-1 call but agreed that she did not tell the truth if she stated that Meadows shot at her. She testified that Meadows did not shoot at her. Rachel did not recall giving statements to the police that night, but she stated that she was truthful when she pled guilty in 2021. She stated that she told Virani to park behind a shed located behind the house so that Meadows would not see his vehicle. Rachel identified a text message that she sent Virani at 8:34 p.m. after the shooting, where she stated, "Don't answer me, but they have your tags and they're looking for you. I'm still taking the blame, don't answer back." Rachel admitted to lying during the initial investigation but stated that she was telling the truth on the stand. Rachel testified that after consoling the girls, she looked outside and saw both handguns in the driveway; she retrieved the guns and put them on her counter.

Zaheer testified that he, Virani, Virani's wife and kids, and their parents lived in an apartment together in Monroe. He stated that they owned a liquor store, Virani would open the store, and he would work the evening shift. Zaheer stated that he and Virani did not have the same circle of friends, and he did not know Rachel or Meadows. Zaheer denied shooting at Meadows or visiting Lake Providence.

Dr. Jessica Esparza testified that she is the DNA technical leader at the North Louisiana Crime Lab and was qualified as an expert in forensic

7

DNA analysis. She stated that she created a preliminary report and supplemental report while working on evidence in this case. She testified that she was able to get partial results from the samples of the guns and could not exclude Virani as a contributor.

Troy Stracener testified that he was the director and firearms examiner at the North Louisiana Crime Lab before retiring and was accepted as an expert in firearms examination. He stated that he identified shell casings and bullets from the scene and Meadows' arm that came from the .380. He testified that none of the fired projectiles or casings came from Meadows' gun.

Timothy Piper testified that he owns a company that assists investigators and attorneys with breaking down cell phone records and coordinates. He was accepted as an expert in "call detail records historical analysis." Mr. Piper prepared a report and map using Virani's cell phone records. He testified that on the evening of the shooting, Virani's cell phone originated on I-20, made its way up to Lake Providence, stayed in Lake Providence for a couple of hours until it moved again around 8:00 p.m., traveled down the highway and on I-20, and then returned to Monroe.

Meadows testified that Rachel did not shoot at him, and at the time of the shooting, he did not know who shot at him. He stated that on the evening of the shooting, he took his daughters to Johnny's Pizza to eat and then took them to Rachel's house. He testified that he helped get the younger girl out of her car seat and was standing on the truck's running board preparing to get back in when Rachel asked if they could talk. He stated that he got out of his truck, shut the door, and walked toward the front of the truck; then, he heard a voice that he did not recognize and a man

8

emerged from the rear of the house. He stated that when he saw the man raise the gun, he shouted "no," the man started walking toward him shooting, he fell to the ground, he got in his truck, the man approached his driver side window and fired, and he backed out of the driveway and drove away. Meadows testified that he called 9-1-1 when he got to the end of the street, but he noticed a car following him. He stated that when the car passed him, he got behind it and gave the 9-1-1 operator the license plate number and then parked on the shoulder and waited for the sheriff deputy to arrive.

Meadows stated that after he was treated at the hospital and gave a statement to the police, his girlfriend took him to get some beer, and he went home. He testified that during the night, the police called him to come back to the station, so his girlfriend drove him back. Officers asked him to identify the shooter in a photo lineup. Meadows admitted that he was not one hundred percent certain that he identified the correct individual that night; it was four o'clock in the morning, he had not slept, and he had a few beers after being shot.

The jury found Virani guilty as charged of attempted second degree murder. Virani filed a pro se "Motion for Judgment Notwithstanding the Verdict (JNOV) Based on Insufficiency of Evidence Judgment of Dismissal/Acquittal", which was denied in court prior to sentencing. Virani was sentenced to 25 years at hard labor without the benefit of parole, probation, or suspension of sentence. Virani's counsel argued a motion to reconsider sentence immediately following sentencing, which was denied. Virani now appeals.

**DISCUSSION**

*Insufficient Evidence*

In his first assignment of error, Virani does not contest that Meadows was shot but contests whether the State presented sufficient evidence to prove that he was present at the residence and was the person who fired multiple shots in the direction of Meadows. Virani asserts that the State failed to negate the reasonable probability of misidentification. Virani points out that Meadows did not identify him in court; Meadows' and Rachel's 9-1-1 calls offered different accounts of the shooting; Rachel gave deputies different stories about the shooting; and Meadows identified Zaheer in a photo lineup. He asks that his conviction be set aside and an acquittal ordered.

Under *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), appellate courts review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

It is the function of the trier of fact to assess credibility and resolve conflicting testimony. *State v. Washington*, 50,424 (La. App. 2 Cir.

3/16/16), 188 So. 3d 350. The trier of fact hears the testimony firsthand and unless the factfinder's assessment of believability is without any rational basis, it should not be disturbed by a reviewing court. *State v. Mussall*, 523 So. 2d 1305 (La. 1988); *State v. Price*, 48,986 (La. App. 2 Cir. 5/15/14), 140 So. 3d 1212, *writ denied*, 14-1274 (La. 2/6/15), 158 So. 3d 814. A factual determination concerning conflicting testimony will not be disturbed on review unless it is clearly contrary to the evidence. *Mussall, supra*; *State v. Williams*, 32,631 (La. App. 2 Cir. 12/8/99), 747 So. 2d 1256, *writ denied*, 00-0734 (La. 11/27/00), 775 So. 2d 441, *and writs denied*, 00-0358, 00-0360 (La. 1/5/01), 778 So. 2d 88. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Hill*, 42,025 (La. App. 2 Cir. 5/9/07), 956 So. 2d 758, *writ denied*, 07-1209 (La. 12/14/07), 970 So. 2d 529; *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422.

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913.

In cases involving a defendant's claim that he was not the person who committed the crime, the *Jackson* rationale requires the State to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Brady*, 414 So. 2d 364 (La. 1982); *State v. Brown*, 51,352 (La. App. 2 Cir. 5/2/17), 223 So. 3d 88, *writ denied*, 17-1154 (La. 5/11/18), 241 So. 3d 1013; *State v. Brock*, 37,487 (La. App. 2 Cir. 9/26/03), 855 So. 2d 939, *writ denied*, 04-1036 (La. 4/1/05), 897 So. 2d 590.

Positive identification by only one witness may be sufficient to support a defendant's conviction. *State v. Brown, supra.*

Second degree murder is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). An attempt to commit an offense occurs when any person, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object. La. R.S. 14:27(A). Although the statute for the completed crime of second degree murder allows for a conviction based on specific intent to kill or to inflict great bodily harm, attempted second degree murder requires specific intent to kill. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Therefore, to sustain a conviction for attempted second degree murder, the State must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. *Id.*

Specific criminal intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop, supra.* Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death. *State v. Minor*, 52,091 (La. App. 2 Cir. 9/26/18), 254 So. 3d 1278. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill.

12

*State v. Henderson*, 56,225 (La. App. 2 Cir. 4/9/25), 409 So. 3d 1069, *writ denied*, 25-00582 (La. 11/12/25); 420 So. 3d 712.

We find the evidence was sufficient to convict Virani of attempted second degree murder. The jury heard that Rachel changed her story multiple times during the investigation. However, it is the jury's decision to accept or reject her testimony. Rachel's final account of the shooting corroborated the evidence submitted at trial, she identified Virani as the shooter, and she stated she asked Virani to kill Meadows in exchange for the insurance proceeds.

In addition to Rachel's testimony, the license plate number of the vehicle led police to Zaheer, who had an alibi for the time of the shooting. Zaheer testified that he rented vehicles for Virani in the past. Although Meadows picked Zaheer out of a photo lineup, he stated the hair was different, and he was not 100 percent certain that it was the correct guy. Meadows was not presented with any lineups that contained Virani.

Virani's cellphone data showed the phone traveling to Lake Providence, being in Lake Providence at the time of the shooting, and traveling back to Monroe. Virani also traveled out of the country immediately following the shooting. DNA from the weapons could not rule out Virani as a possible contributor.

Based on the evidence submitted at trial, we find that the State carried its burden of proving Virani attempted to commit the second degree murder of Meadows. Virani fired a deadly weapon at Meadows with the intent to kill him. This assignment of error lacks merit. We affirm Virani's conviction.

*Free and voluntary statements*

In his second and third assignments of error, Virani argues that once he made an unambiguous request for counsel, questioning of him had to cease. He highlights that he invoked his right to remain silent on the *Miranda* form and at least ten times during the course of the interview. He states that he did not initiate a new conversation with police after invoking his rights, and his statements were not blurted out, unsolicited, or spontaneous. He asserts it was erroneous for the State to put his statement before the jury when it was elicited after his invocation of rights. Virani argues that his requested mistrial should have been granted after his statements were improperly presented to the jury.

Regarding motions to suppress, La. C. Cr. P. art. 703 provides, in pertinent part:

> A. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.
>
> B. A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.
>
> C. A motion filed under the provisions of this Article must be filed in accordance with Article 521, unless opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion, or unless the failure to file the motion was otherwise excusable. The court in its discretion may permit the filing of a motion to suppress at any time before or during the trial.
>
> ***
>
> F. A ruling prior to trial on the merits, upon a motion to suppress, is binding at the trial. Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress.

La C. Cr. P. art. 521(A) provides, "Pretrial motions shall be made or filed within thirty days after receipt of initial discovery, unless a different time is provided by law or fixed by the court upon a showing of good cause why thirty days is inadequate."

Here, the State listed "Virani's Declined Interview" in its sixth notice of discovery on February 15, 2018. On March 19, 2018, the State filed its notice of intention to use defendant's statements. On April 4, 2019, Virani filed "Relief Requested 4," in which, among other things, he requested copies of his statement. On September 15, 2021, the State filed another notice of intention to use his statement. Virani was aware of his statements and the State's intent to use his statements.

Under La. C. Cr. P. arts. 703 and 521, a defendant wishing to suppress an inadmissible statement must file within 30 days of receiving discovery or by the deadline set by the trial court. La. C. Cr. P. art. 703(F) provides, in part, "Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress." Virani has stated a constitutional challenge to the admissibility of his statements, which is assertable by a motion to suppress. Because he did not file the motion to suppress and was well aware of the existence and notice to use his statements, he was unable to object to the admissibility of his statement at trial. We make no ruling on the admissibility of his statement had he properly challenged its use. For these reasons, this assignment of error lacks merit.

*Ineffective assistance of counsel*

Virani argues he had ineffective assistance of counsel. He asserts that when a co-perpetrator receives a benefit to testify, the judge shall instruct the jury to treat the testimony with great caution unless the testimony is "materially corroborated by other evidence." Here, there was no "great caution" charge to jury. Therefore, he argues that the failure of counsel to object to the insufficient jury instructions deprived him of the assistance guaranteed in the federal and State constitutions. Additionally, he asserts that his trial counsel failed to object to the prosecutor's improper reference to his post-arrest silence in rebuttal arguments, and he failed to object to his statement being played for the jury. He asserts a new trial is warranted.

Generally, claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief in the trial court because it provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. *State v. McGee*, 18-1052 (La. 2/25/19), 264 So. 3d 445. However, when the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. *Id*.; *State v. Frost*, 53,312 (La. App. 2 Cir. 3/4/20), 293 So. 3d 708, *writ denied*, 20-00628 (La. 11/18/20), 304 So. 3d 416.

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth the two-prong test to analyze a defendant's claim for ineffective assistance of counsel. First, a defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard

16

of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. *Strickland, supra*; *State v. Moore*, 48,769 (La. App. 2 Cir. 2/26/14), 134 So. 3d 1265, *writ denied*, 14-0559 (La. 10/24/14), 151 So. 3d 598.

The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Hilliard*, 52,652 (La. App. 2 Cir. 8/14/19), 278 So. 3d 1065, *writ denied*, 19-01701 (La. 7/24/20), 299 So. 3d 68; *Moore, supra*.

Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. *Strickland, supra*; *Hillard, supra*. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Id*.

This court declines to address the issue of ineffective assistance of counsel on direct appeal. This matter is more appropriately addressed by filing an application for post-conviction relief in the trial court so that an evidentiary hearing can be held. For this reason, this assignment of error is without merit.

*Excessive Sentence & Sentencing considerations*

Virani argues that his 25-year sentence is excessive. He highlights the testimony of Jessie Caston, who oversees the Riverbend Correctional Center, at sentencing, regarding his trustworthiness and good behavior. He states that the court erred in considering a prior charge instead of the conviction for a lesser offense. He asserts that his prior arrests do not classify him as one of the worst offenders nor would they justify a lengthy sentence to be served without benefits. He highlights that the trial court acknowledged that Rachel was the mastermind behind the shooting and only received a 15-year sentence. He requests his sentence be set aside and remanded for resentencing.

As detailed below, because an error patent review revealed a sentencing issue, we will not be reviewing Virani's sentence for excessiveness but remanding for resentencing.

*Error Patent*

Our review of this record reveals that the trial court did not comply with the obligatory delay before sentencing Virani. La. C. Cr. P. art. 873 provides, "If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." Virani was sentenced immediately after his JNOV was denied. The trial court did not ask, and Virani did not state that he waived the 24-hour delay. Accordingly, we are required to vacate his sentence and remand this matter for resentencing for compliance with La. C. Cr. P. art. 873. *See State v. Grant*, 54,847 (La. App. 2 Cir. 12/14/22), 352 So. 3d 179.

## CONCLUSION

For the foregoing reasons, we affirm Virani's conviction, vacate his sentence, and remand for resentencing.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.**