COX, J.
| following a jury trial, Frederick Lu-juan Brown was convicted as charged of one count of second degree robbery in violation of La. R.S. 14:64.4. Brown was sentenced to 18 years’ imprisonment at hard labor. A timely motion to reconsider sentence was denied. Brown appeals his conviction and sentence. We affirm both the conviction and sentence.
FACTS
In the late afternoon of January 17, 2013, Warren Perkins was at his body shop when a black male entered the establishment and told Perkins that a friend was *93 going to bring his wrecked truck to the shop. Perkins’ employees, Bacilio Mendez and Bryant Johnson, who had not left for the day, saw the man, and one of the employees attempted to talk to him. The man followed Perkins into his office where Perkins inquired as to when the man’s friend would be bringing the truck to the shop. The man then requested to use Perkins’ phone. After the man appeared to make a phone call, and Mendez and Johnson had left the shop, the man lunged across Perkins’ desk and began to beat him repeatedly in the head. Perkins was knocked unconscious and suffered a broken jaw, broken cheekbone and eye socket, and a concussion.[1] While disoriented and bleeding, Perkins made his way out of the shop. One of the employees who had returned to the shop found Perkins and called the police. Perkins’ wallet and more than $9,000.00 cash had been removed from his pocket.
[ gPolice developed Frederick Lujuan Brown as a suspect after speaking with Perkins, Mendez, and Johnson, who had all previously seen Brown in the shop and described Brown, his clothing, and the car he drove. The witnesses also stated that Brown had a “funny made mouth.” After talking to business owners located near the scene of the crime, police received a phone call from the owner of a nearby hotel who indicated that he had the driver’s license of Frederick Lujuan Brown who fit the suspect’s description. Brown had not paid his bill and the hotel owner held his license. Mendez, Johnson, and Perkins were able to identify Brown as the assailant from a photographic lineup shown to them shortly after the crime.
Following a jury trial, Brown was convicted as charged on August 19, 2015. The state filed a second-felony habitual offender bill of information against Brown on September 29, 2015. On November 23, 2015, Brown filed a pro se motion for post-verdict judgment of acquittal which the trial court denied.[2] On April 26, 2016, Brown was sentenced to 18 years at hard labor with credit for time served, to run consecutively with any other sentence.[3] •
On May 17) 2016, Brown filed a timely pro se motion for reconsideration of sentence arguing ineffective assistance of counsel and that the trial court failed to articulate reasons for the length of the sentence imposed.' Brown also urged that the trial court was not aware that he was employed at the time of the. incident and that his family was dependent on his income and would undergo excessive hardship during his incarceration. | aBrown pointed out his voluntary participation in a pretrial drug testing program for two years and his role as a facilitator, which he argued showed that he was particularly likely to respond to probationary treatment which “may result in incidents of this nature ever to recur again.” The trial court denied Brown’s motion to reconsider sentence,[4] and this appeal ensued.[5]
*94 DISCUSSION

Sufficiency of the Evidence

In his first assignment of error, Brown argues that Perkins’ inconsistent testimony .regarding how many times and the reason Brown allegedly came into his body shop, the conflicting descriptions of the attacker made by the witnesses, and the fact that those descriptions also described another individual who was known to drive a vehicle similar to that used by the attacker and to frequent the area where the crime occurred, is- sufficient evidence to establish only that one of two men could have been the attacker. Thus, Brown argues that this evidence established one reasonable hypothesis of his innocence based upon a reasonable probability of misidentification that precluded the jury from convicting him of second degree robbery,[6]
I^Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), appellate courts review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. State v. Tate, 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appéllate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 05-0477 (La. 2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La. 11/6/09), 21 So.3d 297.
It is the function of " the trier of fact to assess credibility and resolve conflicting testimony. State v. Washington, 50,424 (La.App. 2 Cir. 3/16/16), 188 So.3d 350. The trier of fact hears the testimony first hand and unless the factfinder’s assessment of believability is without any rational basis, it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La. 1988); State v. Price, 48,-986 (La.App. 2 Cir. 5/15/14), 140 So.3d 1212, writ denied, 14-1274 (La. 2/6/15), 158 So.3d 814. A factual determination concerning conflicting testimony will riot be disturbed on review unless it is clearly contrary to the evidence. Mussall, swpra; State v. Williams, 32,631 (La.App. 2 Cir. 12/8/99), 747 So.2d 1256, writ denied, 00-0734 (La. 11/27/00), 775 So.2d 441, and writs denied, 00-0358, 00-0360 (La. 1/5/01), 778 So.2d 88. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of-a witness in whole or in part. State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 07-1209 (La. 12/14/07), 970 So.2d 529; State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, 02-3090 (La. 11/14/03), 858 So.2d 422.
*95 The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442; State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied, 09-0725 (La. 12/11/09), 23 So.3d 913.
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Brady, 414 So.2d 364 (La. 1982); State v. Brock, 37,487 (La.App. 2 Cir. 9/26/03), 855 So.2d 939, writ denied, 04-1036 (La. 4/1/05), 897 So.2d 590; Williams, supra.
Face-to-face transactions taking place during daylight hours and the length of time that transpires during the altercation are factors that reduce the likelihood of misidentification. State v. Ruano, 12-1517 (La.App. 4 Cir. 7/31/13), 120 So.3d 908, writ denied, 13-2068 (La. 3/14/14), 134 So.3d 1193; State v. Payne, 04-828 (La. App. 5 Cir. 12/14/04), 892 So.2d 51.
Positive identification by only one witness may be sufficient to support a defendant’s conviction. State v. Davis, 27,-961 (La.App. 2 Cir. 4/8/96), 672 So.2d 428, writ denied, 97-0383 (La. 10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La. App. 2 Cir. 1990), writ denied, 566 So.2d 983 (La. 1990).
| ñEven assuming an out-of-court identification was tainted, an in-court identification does not violate defendant’s due process rights if the in-court identification had a source independent of the out-of-court identification. State v. Bland, 310 So.2d 622 (La. 1975); State v. Newman, 283 So.2d 756 (La. 1973), cert. denied, 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974). A determination of whether the witness’s in-court identification is based upon an independent source involves these factors: (1) the prior acquaintance of the witness with the accused; (2) length of time the witness observed the perpetrator before, during, and after commission of the offense; (3) the circumstances under which the observation was made, including illumination at the scene and physical capacities and emotional state of the witness at the time of observation. Bland, supra.
The crime of second degree robbery is set forth- in La; R.S. 14:64.4 as follows:
A.' (1) Second' degree robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control.of another when the offender intentionally inflicts serious bodily injury.
(2) For purposes of this Section, “serious bodily injury” means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
Thus, to convict defendant of second degree robbery, it is necessary for the state to prove: (1) the taking of (2) anything of' value (3) belonging to another from the person of another or that is in the immediate control of another (4) when the offender intentionally inflicts serious bodily injury. State v. Wiggins, 44,616 (La.App. 2 Cir. 9/23/09), 22 So.3d 1039, writ denied, 09-2329 (La. 4/23/10), 34 So.3d 271.
17At the trial of this matter, Warren C. Perkins, the 71-year-old victim, testified that he was self-employed at his body shop in Caddo Parish. He testified that, on July 17, 2013, shortly before closing, a man he identified in court as Brown came into his business. Brown told Perkins that he had a friend who was going to bring his wrecked truck to the body shop. As his employees *96 were gathered in the front of the business, Perkins went to his office to complete some work. Perkins sat down at his computer when Brown entered the office. As Perkins completed his work, he asked Brown when his friend was going to get to the body shop. According to Perkins, he gave his phone to Brown who “faked a phone call.” Perkins stated that after his employees left, Brown, who was sitting across the desk from him, “jumped up, grabbed me in the hair of the head with one hand and went to work on the side of my face with the other one.”
Perkins testified that Brown “took all the money I had in my pocket,” amounting to more than $9,000.00. Perkins testified that Brown also removed his wallet, which had some money in it, as well as his driver’s license and VA card. The only thing that Perkins remembered Brown saying was “give me that [GD] money.”
Perkins testified that one of his employees returned to the shop, saw the doors open and Perkins’ truck still there, and began looking for him. Perkins testified that he was “probably 60 or 70 yards down the lot.” When he regained consciousness, emergency personnel were taking care of him. Perkins testified that while he was at the hospital, he was able to pick Brown out of a photographic lineup.
Perkins stated that he had a prior interaction with Brown three days before the subject incident when Brown came to the body shop and told [8Perkins that he had “some compressors to sell.” On that occasion, Perkins did not participate in a transaction with Brown, but he gave him $100.00 from his pocket after Brown told him he was “in bad shape” and “needed a place to stay.” On the day he gave Brown money, Perkins had a large handful of money in his pocket and pulled it out to give some to Brown.
Perkins testified that after he gave the officers a description of the suspect, they presented him with two photographic lineups. When shown one of the lineups at trial (“S-l”) Perkins was unable to identify the lineup. Perkins recalled that while at the hospital he was unable to identify anyone in the first lineup shown to him; however, when shown the second lineup at the hospital, Perkins testified that he put his finger on the picture. Perkins was shown a second lineup at trial (“S-2”) and was able to put his finger on a photograph. From the second lineup, Perkins testified that he identified Brown as the person who attacked him. Perkins identified his signature on S-2 with a date of July 18, 2013. Perkins testified that his identification of Brown as the perpetrator was based upon the two times he saw him at the body shop. Perkins stated that at the time of trial, Brown had “cleaned up a lot,” and gained weight.
Perkins identified four photographs depicting his injuries before and after surgery. Perkins revealed that he had been diagnosed with prostate cancer and because of his injuries, was forced to delay his treatment which was scheduled to begin the day after this incident.[7] Although his injuries have healed, Perkins testified that he has experienced residual effects, such as not being able to “see things level anymore,” and movement of his jaw.
|9On cross-examination, Perkins stated that he did not recall giving the police a description of Brown, but knew that he gave a description of the car Brown drove including the fact that the driver’s door was damaged. Perkins testified that he recalled what Brown looked like and remembered him being skinnier, about “six *97 feet,” wearing blue jeans and an untucked shirt. Although Perkins did not recall giving anyone a description of the assailant’s complexion, he conceded that he may have told the officer that the suspect was a dark-skinned male who was about 5’9‘ or 510/ Perkins conceded that the assailant’s skin was darker than his counsel’s complexion, but explained that he had never described a person as being “dark complected.” Perkins stated that if this is what he told the police, “it would be correct.”
Perkins insisted that Brown was the same person that he had seen before the incident. Perkins recalled that Brown seemed “overly friendly” which was odd for a first meeting and that this conclusion “held true for the second time.” Perkins recalled that the offender’s mouth had “one side drooping slightly,” and that it was obvious. Perkins did not recall making a statement at the hospital, but remembered a detective being there. Perkins recalled hearing the name- “Catfish” that night, but did not recollect that the officer told him that Catfish had-attacked-him.
Perkins confirmed that he had given Brown money “the day before” the incident. Perkins stated that he has given complete strangers money before and testified that if he felt someone was hungry, he would help them out. Perkins recalled that when he gave Brown money, they had a conversation about his not having a job or a place to stay.
Perkins stated that he saw Brown again some two to three days later, on the day of the attack. Perkins now understood that story tó be “a ploy to | mget me to stay there by myself until the .other employees were gone.” Perkins was not sure that he stated that the man came by his shop three days in a row attempting to sell compressors. Perkins testified that his “memory is not the best” after what he went through, but was 100% sure that it was “the same person with all of these events.”
Perkins stated that he saw the vehicle Brown drove “the first time he was there,” and the “second time he was there.” Perkins testified that he saw the car “in a lot down the street,” “two doors down from my shop,” with a “lady sitting in it.” When he saw the car again, it was at his place of business. According to Perkins, Brown would park the car “not directly in front of the shop, but off to the side.” Perkins testified that he Came to court “maybe a month ago,” and saw Brown walk through the door.
On redirect, Perkins explained that he had been to court about a month earlier to “identify” Brown as the individual who robbed and injured him. Perkins testified that Brown was scheduled to go to trial that day,, but it was postponed. Perkins verified that the prosecutor wanted to establish that Brown was the person who was going to stand trial for robbing him. Perkins again identified Brown as the man he had seen two times in his business and confirmed that he never identified Catfish as' the man who robbed him.
Bryant Johnson, one of Perkins’ employees, testified that he was in the office area prior to the attack. Johnson saw an individual that he identified in court as Brown come into the office around 3:00 or 3:30 p.m. Johnson was the first person who saw Perkins after the beating. Johnson testified that he “got him and brought him back into the office.” Perkins was “bleeding real bad,” according to Johnson, and he and another individual “kind of patched him up and stopped the bleeding,” before calling 911. In Johnson stated that Perkins “was kind of out of it,” although he knew what was going on. Johnson had never seen Brown before the day of the attack or noticed whether he came into the shop before. Johnson explained that he was in *98 the front of the shop that day because he had a bunch of stuff he had to get done and was going to stay and work. Johnson saw no one other, than Brown come into the office the day of the attack and was sure that the person he saw was Brown.
Johnson testified that he approached Brown and asked if there was anything he could do for him.' Johnson stated that Brown said something he could not understand and “kind of turned away,” so Johnson went back to what he was doing. Johnson confirmed that he got a good look at Brown and described him as being “a black guy” about 5’8‘-6’ tall, with an odd walk and “his face looked, a little funny.” Johnson recalled that Brown had a “brown, somewhat dark complexion,” and that his mouth was “shaped different” meaning it “was drawn up on one side, or something.” Johnson denied making a statement to police that he had seen Brown on three separate occasions.
On re-direct, Johnson testified that he had seen two photographic lineups, and that he was pretty sure he selected Brown out of the second lineup. Johnson: was shown S-l and stated that the-individual who entered the body shop was not in that lineup. Johnson was shown a second lineup, entered into evidence as S-7, and testified that he identified Brown from this lineup. Johnson identified his signature on the back of S-7 which identified No. 4, the fourth person in the lineup, as the individual who entered the body shop. Johnson confirmed that Brown was the last person in the office with Perkins when he left the shop on the day of the attack.
I laOorporal Clinton Grigsby, of the Shreveport Police Department testified that he responded to the subject robbery on July 17, 2013. At the scene of the crime, he made contact with two of the body shop employees, Mendez and Johnson. Johnson told Corp. Grigsby that he and Mendez saw a black male wearing a white T-shirt and blue, jeans speaking with Perkins. Corp. Grigsby testified that Johnson and Mendez told him they left the shop for a moment and when they came back found Perkins injured and bleeding.
Corp. Grigsby testified' that Perkins informed him 'at the hospital' that he was approached by a black male who had been coming into his shop several'times during the day. Corp. Grigsby stated that Perkins indicated that the man wanted him to buy compressors-and that Perkins told the suspect that he was not interested.. Corp. Grigsby testified that Perkins informed him that he sat down in front of his computer and the “suspect stood up over him and punched him several times, knocking him unconscious.” Perkins was not able to give Corp. Grigsby a name. Corp. Grigsby then made contact with Corp. Jermaine Babers, the beat officer who patrolled the area. The ■ suspect's description sounded familiar to Corp. Babers who provided the name “Catfish” as a suspect. Corp. Grigs-by relayed the information to a detective.
On cross-examination, Corp. Grigsby testified that none of the witnesses he talked -to at the scene could name the suspect. When Corp. Grigsby spoke to Perkins at the hospital, Perkins gave him a description of the perpetrator which included the fact that he was a dark-skinned male who was 5’9‘ tall, weighed 170 lbs and had something wrong with his mouth. Corp. Grigsby did not recall if Perkins gave him any specific detail regarding what was wrong with the suspect’s mouth. According to .Corp. |1sGrigsby, Johnson and Mendez described the red vehicle driven by the suspect, and Corp. Grigsby relayed the information to Corp. Babers, who was trying to find a possible suspect. Corp. Grigsby stated .that Perkins, Mendez, and Johnson told him that the suspect had been in Perkins’ place of business *99 approximately three times. On re-direct, Corp. Grigsby testified that the witnesses told him that the suspect had an overbite.
Corp. Ronald Debello, a patrol officer with the Shreveport Police Department, testified that he was on duty on July 17, 2013, and responded to the robbery call at issue. Corp. Debello testified that, when hé arrived at the scene, he found a male lying on the ground in front of the business. The man was in and out of consciousness, covered in blood, and could not talk very much. Corp. Debello began talking to the employees, who told him that they heard a commotion and found Perkins bleeding. The employees stated that “someone had robbed them.” Corp. Debello investigated the scene and saw “evidence of where' a struggle had happened.” Corp. Debello found á “biood trail through the business into the back and then found where the office was.” Corp. Debello stated that there were signs of a struggle in the office; items on the desk were knocked over, and the chair was turned over. Corp. Debello testified that there was a “large puddle of blood on the floor next to where the chair was laying.”
Corp. Debello testified that none of the employees saw the assault, but “they remembered the last person who was in the business.” The employees gave a description of the person as a thinner black male with a low-fade haircut, no facial hair, and “funny teeth” or a “jacked-up grill.” The employees described the man’s car as a maroon-colored, four-door Ford |14Taurus that had dents on the driver’s side doors and stated that the man “had been coming in with it in regards to, you know, having some repairs done.”
Corp. Debello testified that he started “canvassing around,” and found Mr. Joseph Best, the ovráer of a tow company, two businesses down, who said that he had seen a “red, four-door vehicle with dents in it” speed off, “right before the fire trucks got on scene.” Mr, Best stated that he had “seen the vehicle driving up and down the street several times during the day” being driven by a black male driver and a white female passenger. Mr. Best told Corp. De-bello that he had seen the car coming back and forth “a number of times” from a hotel located down the street from the body shop, but that when it “sped off, it just went westbound on Greenwood Road and kept going.”
Mr. Best testified that he owned the tow company located “two buildings west” of Perkins’ body shop. Mr. Best recalled giving a statement to police in July of 2013. Mr. Best testified that while he 'was “cleaning up” in the back of his business, he noticed a vehicle sitting on his property. Mr. Best described the vehicle as a red four-door Ford Taurus. Mr. Best considered the vehicle to be suspicious because he .saw it “sitting there at the far end of my property facing to the east towards the body shop.” According to Mr. Best, he saw the man in the car speak with a woman outside the vehicle, but as Best walked toward the office, “the car kind of erratically left and went next door to the motel and parked.”
■ Corp. Babers, a patrol officer with the Shreveport Police Department, testified that he was familiar with the towing company, motel, and the body shop as part of the area he patrols. Corp- Babers was not on duty the day of the robbery, but Corp. Grigsby called him and asked if he knew anybody |iathat fit the description of the suspect in- the ease. From the description, Corp. Babers gave Corp. Grigsby the name James Minor, who went by the nickname “Catfish,” to “check out.” Corp. Ba-bers testified that this individual did not turn out to be the person Corp. Grigsby was looking for.
*100 On cross-examination, Corp. Babers described Catfish as being dark-skinned, approximately “6’ to 6’2,” and weighing 200-230 lbs, but could not recall anything about his teeth or what sort of vehicle he drove. Corp. Babers testified that it was possible that Catfish had an overbite. Based upon the description he was given, Corp. Babers felt confident that James “Catfish” Minor could be a person that they needed to talk to. On redirect, Corp. Babers testified that he felt that Minor was someone the police might want to talk to because he “hangs in that area all day,” at the car wash that was “right down the road from where this incident occurred.”
On July 17, 2013, Jeff Wilcox testified that he was the 25-year owner of a motel located a “couple hundred yards” from the body shop. Wilcox spoke with Det. Morrison regarding the robbery. Wilcox recalled that Det. Morrison came to him looking for “a room number or a certain person.” Wilcox informed Det. Morrison that he “had the guy’s driver’s license,” because he did not have enough money to pay for his room, and Wilcox held the license until the man came back to pay his bill. Wilcox recalled that Det. Morrison gave a description of a suspect; Wilcox felt that the description matched the person who owned the license. Wilcox testified that he got the license the day before the officers came by, and identified the man who gave him the license in court as Brown. Wilcox testified that the license had Brown’s name on it and recalled that Brown came back to the hotel “a day | 1flor so later,” and wanted his license back. Wilcox had already given the license to Det. Morrison and told Brown that he did not have it.
On cross-examination, Wilcox testified that Brown rented a room from him, but he did not notice the type of car Brown drove. Wilcox testified that “back then,” Brown was 170-180 lbs and about 5’10‘ or 5’11‘. Wilcox recalled that Brown had “gold crowns,” and stated that his mouth was odd looking. Wilcox recalled that Brown had stayed at his hotel “numerous times,” over a couple of years, so he knew what he looked like. Wilcox stated that Brown had been gone from the hotel about three or four days, when the detective came to the hotel.
Det. Morrison, a 14-year veteran of the Shreveport Police Department, testified that he was the on-call robbery detective on January 17, 2013, and investigated the robbery at issue. Det. Morrison secured an arrest warrant for Brown and identified him in court. When Det. Morrison arrived at the scene, he spoke with Corp. Debello who advised that Perkins was beaten by a black male who fled the scene in a red Ford Taurus with a dent in the driver’s side. The black male was described as being between 5’7‘ and 5’10‘, weighing between 150 and 200 lbs. Det. Morrison testified that Corp. Debello told him that he had a possible suspect named James Minor. Det. Morrison prepared a six-person lineup containing Minor’s photograph and went to the hospital to contact Perkins. Perkins told Det. Morrison that a black male came into his office three days in a row trying to sell him air compressors, but he declined every time. Perkins told Det. Morrison that on the day of the crime, the black male came into his office once again trying to sell air compressors. Perkins told Det. Morrison that at some point, he looked down at his computer screen and the black man “came across the |17desk and began beating him in the head,” knocking him to the ground and hitting him to the point of unconsciousness. Perkins told Det. Morrison that once he regained consciousness, he realized his money was gone from his pocket and he stumbled to get help from his employees. Perkins told Det. Morrison *101 -that he could identify his assailant if he saw him again.
Det. Morrison then presented Perkins with S-l, the “original” lineup showing Catfish, that he prepared and identified in court. Det. Morrison testified that “Image No. 4” was Catfish., Det. Morrison also showed S-l to Mendez and Johnson. Det. Morrison testified that Mendez and Johnson both stated they saw the suspect come into the shop on three different days. Perkins, Johnson, and Mendez were all unable to identify the suspect in S-l.
Det. Morrison explained that his procedure is to allow everyone to view the lineup separately from the others so that no one is biased. Det. Morrison has the person point to the person they believe is the suspect and then circle the suspect and sign the back of the lineup. Det. Morrison testified that nobody signed on the back of S-l, meaning that they did not pick anybody from it.
Because Perkins, Mendez, and Johnson all described the black male as having something wrong with the top of his mouth, Det. Morrison went back to the scene and “canvassed the areas talking to all the businesses” in an attempt to locate video or witnesses who saw the vehicle in the area. That afternoon he received a phone call from Wilcox informing him that he “had a Texas ID of a black male that fit the description of the suspect.” Det. Morrison considered Brown to be a suspect because the ID photograph showed something wrong with his mouth and he fit the height and weight description. Det. Morrison placed Brown’s photograph in a six-person | ^lineup (“S-7”) with Brown’s photograph as No. 4. From looking at, the back of the lineup, Det. Morrison testified that that both Mendez and Johnson selected photograph No. 4 of Brown as the suspect. Det. Morrison identified a third lineup he prepared, S-2, with Brown’s photograph as No. 6. Det. Morrison could state no particular reason for preparing the two lineups, other than the fact that the order of the pictures did not matter because “if they either know the suspect, they recognize the suspect or they don’t.” Det. Morrison testified Perkins selected photograph No. 6, Brown’s photograph, from S-2. Det. Morrison confirmed that each witness was shown the two different lineups independently of the other witnesses. According to Det. Morrison, from the 12 photographs shown to them, none of the three eyewitnesses identified James Minor as the perpetrator, but all three identified Brown as the person who assaulted Perkins. Once he received the positive identification, Det. Morrison obtained a warrant for Brown’s arrest on July 19, 2013, and arrested Brown on July 28, 2013.
On cross-examination, Det. Morrison confirmed that he interviewed Johnson the same day as the incident at the body shop and prepared a narrative. Det. Morrison confirmed that Johnson told him that the suspect “had been coming back and forth to the business for the past three days,” including the day of the crime and the two days previous. Det. Morrison testified that the main thing Johnson wanted him to know was that there was something wrong with the suspect’s mouth in the upper lip area. Det. Morrison did not inquire further into the description of the suspect’s mouth, but “took it as it’s something was wrong with his upper lip, because they would point to' the area as they were talking to me.” Det. Morrison testified that Perkins also talked about a problem with the suspect’s mouth. Det. | ^Morrison confirmed that he was given the description of the suspect as being 5’7‘ to 5’10‘ and the name of “Catfish” as an individual who fit the general physical description. Det. Morrison made contact with Catfish because he was arrested on a separate warrant and *102 was in jail, and he did not notice anything wrong with his mouth.
When Det. Morrison received Brown’s ID from Wilcox, he knew that his description met that of the suspect; Brown’s upper lip “looked to be different than a normal mouth” in that his top lip seemed to be pushed back farther. From the photograph, Det. Morrison identified the difference “from a normal lip,” and seemed to “be pushed back further.” Det. Morrison testified that the phrase “messed up mouth” could mean many things, depending on the person’s interpretation. Det. Morrison testified that he inquired from the witnesses what this meant and- “they kept giving me the same explanation.” Det. Morrison stated that when he prepared a lineup, the suspect’s description is placed in the system which will “pull up people,” that fit the parameters. Det. Morrison testified that he wanted “people who look similar to [the suspect] in the lineup.” Det. Morrison confirmed that the photo lineups were shown to the witnesses in black and white photographs.
Det. Morrison testified that he spoke with Brown upon his arrest. Det. Morrison noted that his “mouth did look different,” specifically his upper lip which sat “further back” than his “bottom lip.” Det. Morrison stated that in general most people do not have overbites or underbites.
. Det. Morrison stated that the car, described to him as a four-door maroon vehicle with a dent .in. the driver’s side, was never apprehended- and was not being sought. Det. Morrison conceded that Catfish was believed to drive a car with the same physical characteristics and that is why he included |2nCatfisli in the initial lineup. Det, Morrison confirmed that the individuals he interviewed stated that they saw a red car in the parking lot being driven by the person who came to the business .on three separate occasions fitting Brown’s description, Det. Morrison conceded that in the lineup photograph, Catfish’s bottom lip poked out “slightly” more than his top lip. Det. Morrison insisted that, in his opinion, Brown’s mouth was different from Catfish’s mouth.
On redirect, Det. Morrison testified that when he entered the parameters of the suspect to prepare a lineup, he was required to specify black male only; and could not specify the darkness or lightness of the suspect’s skin tone. Det. Morrison testified that he went to the jail to interview, Catfish, but at that point, the witnesses had already stated that he was not the man they saw enter the body shop, and he was not a suspect.
After the state rested its case, Brown offered no evidence or testimony in his defense.
Brown does not contend that the elements of the crimes have not been proven. Rather, he argues that the evidence was insufficient to establish that he was the person who committed the crime considering the inconsistencies in the descriptions of the assailant given by Perkins and Johnson, and the fact that another individual fitting the description of the assailant was in fact pursued as a possible suspect. Since the insufficient evidence claim is that Brown was misidentified as the perpetrator of these crimes, the question is whether the state negated any reasonable probar bility of misidentification. State v. Brock, supra.
The record supports the conclusion that the state negated any reasonable probability of misidentification. Perkins positively and | ^unequivocally identified Brown in court as the perpetrator. This identification was independently based upon Perkins’ opportunity to view Brown face-to-face before and- during the offense in the body shop and a few days before the inci *103 dent when he gave Brown money. Further, Perkins identified Brown in the lineup shown to him immediately after the crime, and clearly did not identify Catfish as the perpetrator. Thus, Perkins’ testimony alone is sufficient to support Brown’s conviction. Brock, supra. Furthermore, Perkins’ identification of Brown was corroborated by Johnson and Mendez who observed Brown prior to the incident and identified him as the perpetrator in a lineup shown to them immediately after the crime. Johnson had the opportunity to speak with Brown. The two employees consistently noted that the assailant had a funny mouth and neither identified Catfish as the assailant. Resolution of minor inconsistencies in the witnesses’ desóriptions of the assailant depends on the credibility of the witness and the weight of the evidence, not the sufficiency. The resolution of these matters remains within the province of the jury and will not be disturbed on appeal. Id. The strength of the witnesses’ identification of Brown as the assailant is sufficient to exclude Catfish as a suspect in these crimes. Accordingly, we conclude that the evidence was sufficient to support the conviction. This assignment is therefore without merit.

Excessive Sentence

In his second assignment of error, Brown' argues that given the facts of this case, the trial court erred by imposing an excessive sentence of 18 years at hard labor. Brown argues that he responded well in jail pending trial, was 44 years old with some education, and supported his family. |a2Brown argues that for these reasons, the sentence serves no purpose and it grossly out of proportion to the severity of the crime.
In reviewing a sentence for ex-cessiveness, an appellate court uses a two-step process. First, the record must- show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, -not rigid or mechanical compliance with its provisions. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La. 1983); State v. Washington, 50,337 (La.App. 2 Cir. 1/13/16), 185 So.3d 852, writ denied, 16-0224 (La. 2/3/17), 215 So.3d 688, 2017 WL 527669. The important elements to be considered are the defendant’s personal history (age, -family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); Washington, supra; State v. Ates, 43,327 (La.App. 2 Cir. 8/13/08), 989 So.2d 259, writ denied, 08-2341 (La. 5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Thompson, 50,392 (La.App. 2 Cir. 2/24/16), 189 So.3d 1139; State v. Caldwell, 46,718 (La.App. 2 Cir. 11/2/11), 78 So.3d 799.
Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const, art. I, § 20, if it is grossly out of proportion to the severity of the crime or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Lewis, 49,138 (La.App. 2 Cir. 6/25/14), 144 So.3d 1174, writ not cons., 16-0235 (La. 3/14/16), 188 So.3d 1070. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La. 1/16/02), 805 So.2d 166; Lewis, supra.
*104 The trial court has wide discretion in the imposition of sentences within the statutory limits, and sentences should not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Williams, 03-3514 (La. 12/13/04), 893 So.2d 7; State v. Allen, 49,642 (La. App. 2 Cir. 2/26/15), 162 So.3d 519, writ denied, 15-0608 (La. 1/25/16), 184 So.3d 1289. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. Allen, supra; State v. Zeigler, 42,661 (La.App. 2 Cir. 10/24/07), 968 So.2d 875.
On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Jackson, 48,534 (La.App. 2 Cir. 1/15/14), 130 So.3d 993.
At the time of the offense, Brown faced sentencing exposure of not less than 3 years and not more than 40 years at hard labor for his second degree robbery conviction under La. R.S. 14:64.4.
At Brown’s sentencing hearing on April 26, 2016, the trial court noted its consideration of a presentence investigation report (“PSI”) as well as letters from Brown and a few people on his behalf. The court then specifically considered the La. C. Cr. P. art. 894.1 factors for imposing sentence, including the fact that, if a suspended sentence were imposed, there was an undue risk that Brown would commit another crime. The court | ^reviewed a letter from Dr. Cole Flournoy, who stated that he believed Brown had reached a point in his life where he was aware of the error of his ways and the harm caused to himself and others. The court deemed Brown to be in need of correctional treatment and determined that a lesser sentence would deprecate the seriousness of Brown’s crime. The court regarded Brown’s conduct during the commission of the offense as deliberate cruelty that included threats of or actual violence resulting in significant permanent injury to the victim who Brown knew or should have known was particularly vul-nei’able or incapable of resistance due to his age. The court next considered Brown’s receipt of nearly $10,000.00 cash from the victim’s person as a major economic offense that caused significant economic loss to the victim or his family.
The court reviewed Brown’s eight-page felony criminal history including the following convictions:
1) 1995-Texas, forgery conviction which resulted in a two-year sentence after a probation revocation;
2) 2001-Caddo Parish, aggravated burglary and simply robbery convictions;
3) 2005-Texas, forgery conviction with a 14-month sentence;
4) 2005 felony illegal possession of stolen things;
5) 2008 conviction for unauthorized use of a motor vehicle that resulted in a two-year hard labor sentence;
6) 2011 Texas, conviction of possession of a controlled dangerous substance that resulted in two-year sentence after a probation revocation;
7) 2011-Texas, forgery conviction that resulted in a two-year sentence after a probation revocation.
The trial court also considered that Brown had an active warrant for his arrest in Texas for the theft of a firearm and an alleged robbery and noted 125that “there is a [failure to appear] detainer out of Bossier for something” that occurred in 2003.
In mitigation, the court took into account that Brown completed a pretrial detention program and received a positive letter from the leader of the group. The *105 court observed that Brown seemed like “a nice' guy” in court, but that it was not sentencing Brown for his conduct in court. Brown was allowed to address the trial court and stated that he did not understand why the active warrant in Texas was still on his record because it related to events that occurred 16 years earlier which had been resolved..
The trial court considered as negative the fact that Brown maintained his innocence and expressed “grave, grave” concern that Brown was a seventh-felony offender. The court balanced Brown’s age of 44, apparent good health, and education, against the gravity of the offense- and Brown’s criminal history. After reiterating consideration of the La. C. Cr. P. art. 894.1 factors, the court sentenced Brown to 18 years at hard labor with credit for time served consecutive to any other sentence Brown was facing or serving. The court recommended that Brown attend any substance rehabilitation programs available, noted that the offense was a crime of violence, and informed him of the applicable post-conviction relief delays.
The record before us demonstrates adequate La. C. Cr. P. art. 894.1 compliance by the trial court who adequately reviewed Brown’s personal, work, educational, and criminal background prior to imposing sentence. After considering these factors, the court specifically determined that there was an undue risk that Brown would commit another crime and would not be likely to respond to probationary treatment. The court balanced the seriousness of the offense against the positive progress Brown had made in a 12fiPretrial detention program. Even considering the hardship allegedly encountered by Brown’s family due to his incarceration, the record demonstrates an adequate factual basis for the sentence imposed.
Likewise, the chosen penalty is not grossly disproportionate to the severity of the crime as to shock the sense of justice. As noted by the trial court, this violent crime involved deliberate cruelty to an elderly victim that resulted in significant permanent injury. Brown has an extensive felony criminal history and has obviously failed to benefit from prior probationary treatment-or be rehabilitated by prior leniency in sentencing. For the second degree robbery conviction, Browpi faced a maximum sentencing exposure of 40 years at hard labor, and received a midrange sentence. After reviewing the record and considering all of the factors, we find that the trial court acted within its discretion in the sentence imposed. This assignment of error is without merit.[8]

Suggestive Identification

Brown argues that the identification process in this case is suggestive under Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), based upon the fact that Det. Morrison allegedly tainted and tampered with the identification procedure when he obtained Brown’s ID from .the hotel manager and named Brown as a suspect in the robbery. Brown argues that Det. Morrison took the license back to. the body shop and showed it to Perkins, Johnson, and Mendez and asked them if the suspect was the man in the driver’s license photo. Brown argues that this is a | ¡^violation of his Fourth, Sixth, and Fourteenth Amendment rights. Brown also claims that Perkins’ identification of him during a previous pretrial hearing violated his due process rights.
*106 A defendant attempting' to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misiden-tification as a result of the identification procedure. State v. Sparks, 88-0017 (La. 5/11/11), 68 So.3d 435, cert. denied, 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012). An identification procedure is unduly suggestive if, during the procedure, the witness’s attention is unduly focused on the defendant. Id. The central question is whether under' the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); Sparks, supra. Thus, despite the existence of a suggestive pretrial identification, an in-court identification is permissible if, under all the circumstances, there does not exist “a very substantial likelihood of irreparable misidentification.” Manson, supra.
Brown’s argument that the subject lineup was suggestive is without merit. A review of the record reveals that the lineup's shown to the witnesses were not suggestive'in nature. The testimony of the witnesses and Det. Morrison established that proper procedure was followed in preparing and viewing the lineups. The witnesses were shown the lineups individually, and were not influenced by each other’s choices. There is no evidence that the officers made any suggestions as to which suspect should be chosen.
' Likewise the photographs chosen for the lineups were similar m appearance, and Brovra was not distinguished by any substantially different [ ^physical characteristic. Thus, the record is clear that Brown was not singled out in any suggestive manner in the lineups, and the identifications were not shown to be impermissibly suggestive. Despite Brown’s argument, there is no testimony to establish that Det. Morrison ever showed Brown’s ID to the witnesses.
Regarding Perkins’ identification'of Brown at the initial trial setting, the record is unclear about the context of the identification. It appears that Perkins was sitting in the audience when Brown appeared for trial. The transcript seems to establish that through Perkins, the prosecutor somehow.-sought -to “verify” that Brown was the defendant in this matter. In brief, the state concedes that Perkins made the' identification at an earlier trial setting. While arguably unconventional and possibly intentional, because the parties were present for - Brown’s trial, it would not be unusual for the victim to see the defendant when he enters the courtroom. Nevertheless, because Brown had previously been identified as the assailant by three witnesses including Perkins, any error in this verification procedure would be harmless. Furthermore, when immediate and definite- identifications result from inadvertent- meetings between the victim or witness and suspects, and there is no indication of impropriety or suggestiveness, an out-of-court identification will be found both reliable and admissible. State v. Guillot, 526 So.2d 352 (La. App. 4 Cir. 1988), writ denied, 531 So.2d 471 (La. 1988), writ denied, 531 So.2d. 481 (La. 1988).

Ineffective Assistance of Counsel

In his final assignment of error, Brown raises two claims of ineffective assistance of counsel. Based upon the arguments asserted in the previous pro se assignment of error, Brown argues that his counsel was ^ineffective for failing to argue Brown’s pretrial motion to suppress evidence of identification. Brown also argues that his counsel was ineffective for failing to argue the merits of Brown’s pro se post-trial *107 motion for post-verdict judgment of acquittal challenging the. strength of the evidence presented at trial.
Generally, a claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief (“PCR”) in the trial court. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La. 1982); State v. Wilson, 50,865 (La.App. 2 Cir. 11/16/16), 208 So.3d 999; State v. Joshua, 50,566 (La.App. 2 Cir. 8/10/16), 201 So.3d 284; State v. Ellis, 42,520 (La.App. 2 Cir. 9/26/07), 966 So.2d 139, writ denied, 07-2190 (La. 4/4/08), 978 So.2d 325. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. Id. When the record is sufficient, the claim may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La. 1982); State v. Willars, 27,394 (LaApp. 2 Cir. 9/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The assessment of an attorney’s performance requires that his conduct be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions, and trial strategy. There is a strong | anpresumption that trial counsel has exercised reasonable professional judgment. State v. Cook, 48,355 (La.App. 2 Cir. 11/20/13), 127 So.3d 992, writ denied, 13-3000 (La. 5/30/14), 140 So.3d 1174; State v. Tilmon, 38,003 (La. App. 2 Cir. 4/14/04), 870 So.2d 607, writ denied, 04-2011 (La. 12/17/04), 888 So.2d 866.
Once the attorney’s performance is found to have been deficient, the defendant must show that counsel’s deficient performance prejudiced his defense. This element requires a showing that the errors were , so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland, supra. The defendant must prove the deficient performance caused him an actual prejudice so severe that, but for his counsel’s deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different. Strickland, supra; Cook, supra.
Ineffective assistance claims must both identify specific acts or omissions by counsel and state how these actions resulted in actual prejudice so severe that the defendant was denied a fair trial. Strickland, supra; Cook, supra,
Counsel’s decisions as to which motions to file or pursue form a part of trial strategy. State v. Hoffman, 98-3118 (La. 4/11/00), 768 So.2d 542, supplemented, 00-1609 (La. 6/14/00), 768 So.2d 592.
Both of Brown’s claims relate to issues that were raised and addressed in this appeal regarding to the sufficiency of the evidence and the issue of misidentifi-cation. The failure to file or argue a motion in itself does not constitute ineffective assistance of counsel. A defendant is required to show that actual prejudice occurred and that but for his counsel’s deficient performance, there is a reasonable probability that the outcome of the I ^proceedings would have been different. See State v. Felder, 00-2887 (La.App. 1 Cir. 9/28/01), 809 So.2d 360, 370, writ denied, 01-3027 (La. 10/25/02), 827 So.2d *108 1173. In this matter, counsel’s decisions to refrain from arguing the merits of Brown’s pro se motions formed part of his trial strategy. Moreover, because we have determined that the evidence was sufficient to support Brown’s conviction and that the state negated any reasonable probability of misidentification and rejected Brown’s claim that the lineup was suggestive, Brown will not be able to establish actual prejudice or that counsel’s failure to argue his motions would have changed the outcome of the case. Thus, we conclude Brown cannot show that he received ineffective assistance of counsel based upon these claims. Accordingly, we reject these assignments of error.
CONCLUSION
Finding no merit in Brown’s assignments of error, we affirm the defendant’s conviction and sentence.
AFFIRMED.
APPLICATION FOR REHEARING
Before MOORE, PITMAN, GARRETT, STONE and COX, JJ.
Rehearing denied.

. Perkins was being treated for cancer and, as the result of his injuries, Perkins’ cancer treatment was delayed.

. The “Ruling,” filed on December 22, 2015, denied Brown’s pro se motion on the grounds that' the trial court was not required to entertain motions filed by a defendant who is represented by counsel.

. The sentencing transcript shows that the trial court sentenced Brown "without the multiple offender bill” because the state had not received the "Pen Pack.”

.Notably, the trial court' erroneously found Brown’s motion to be untimely and that the court had no authority to amend the sentence because Brown had already started serving his sentence. Further, Brown’s motion to reconsider was signed on May 26, 2016, one day after the appeal was granted on May 25, 2016. Nevertheless, the trial court retains ju *94 risdiction to rule on a motion to reconsider sentence under La. C. Cr. P. art. 916(3),

. Brown’s appellate counsel filed a timely brief on November 21, 2016, the. last day of the brief filing deadline. Brown sought an extension of his brief filing delays which was denied by this Court on January 5] 2017. Thereafter, Brown filed an untimely pro se brief on January 17, 2017.

. In his pro se assignment of error number one, Brown makes additional arguments that the evidence was insufficient to convict him because there was no physical evidence connecting him to the crime or surveillance cameras showing that he was at the location of the crime, along with inconsistent explanations from Det. Morrison on how Brown became a suspect, With the valid positive eyewitness identifications of Brown being sufficient evidence to support the conviction, however, Brown's arguments have no merit.

. Perkins was in remission as of the time of trial.

. Notably, in his pro se brief, Brown argues that the excessive sentence claim raised by his appellate counsel is "moot,” because the sentence is not excessive.